```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,     ) Criminal Action
                                     ) No. 21-cr-312
4                      Plaintiff,    ) Initial Appearance,
                                     ) Detention Hearing,
5      vs.                           ) Arraignment (Cont.)
                                     )
6      Bradley Stuart Bennett,       ) Washington, DC
                                     ) April 30, 2021
7                      Defendant.    ) Time:  12:13 p.m.
       _____
8
            TRANSCRIPT OF INITIAL APPEARANCE, DETENTION HEARING,
9                  ARRAIGNMENT (CONT.) HELD BEFORE
                 THE HONORABLE JUDGE G. MICHAEL HARVEY
10                  UNITED STATES MAGISTRATE JUDGE
       _____
11
                         A P P E A R A N C E S
12
       For the Plaintiff:      Monica Stump
13                             Assistant United States Attorney
                               555 4th Street NW
14                             Washington, DC  20530
                               Email:  Monica_stump@usdoj.gov
15
       For the Defendant:      Albert S. Watkins
16                             Kodner Watkins, LC
                               7733 Forsyth Boulevard
17                             Suite 600
                               Clayton, MO  63105
18                             Email:  Albertswatkins@kwklaw.net

19     Also present:           Shay Holman
                               Pretrial Services
20


21     Proceedings reported by audio recording.
       _____
22
       Transcribing Court Reporter:
23                             Janice Dickman, RMR, CRR, CRC
                               Official Court Reporter
24                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
25                             Washington, DC  20001
                               202-354-3267
```

1          THE COURT:  Mr. Tran, please call the next case.

2          THE COURTROOM DEPUTY:  This is case 21-CR-312, the

3     United States of America versus Bradley Stuart Bennett.  This

4     is scheduled to be a continued detention hearing, held by

5     video.

6          Will the parties please introduce themselves to the

7     Court, beginning with the government?

8          MS. STUMP:  Good afternoon, Your Honor.  Monica Stump

9     on behalf of the United States.

10          MR. WATKINS:  Al Watkins on behalf of the defendant.

11          PRETRIAL SERVICES:  Shay Holman, pretrial services.

12          THE COURT:  All right.  I had a few additional

13     questions before I rule here today, which I intend to do.  The

14     first is I don't know if it came up the other day or not, the

15     pretrial services report suggests that there is a warrant

16     that's out for Mr. Bennett right now, is that correct?

17          Government?

18          MS. STUMP:  Yes, Your Honor.  I have spoken to the

19     FBI in San Antonio about that warrant that is standing there.

20     We believe that warrant to be the warrant for this case.  And I

21     have requested that it be removed from the system.

22          THE COURT:  Okay.  Well, that's what I thought it

23     might be.

24          MS. STUMP:  Yes, sir.

25          THE COURT:  Mr. Watkins, anything to add?

1           MR. WATKINS:  I didn't know anything about it until I

2    saw it on the pretrial services report, and I assumed that it

3    related to this, but I didn't get clarity.

4           THE COURT:  Okay.  Well, it sounds like it is.

5    Disorderly conduct, which is one of the charges that he's

6    facing in this case.

7           MR. WATKINS:  Right.  And, Your Honor, I did garner

8    confirmation of the lease of 13800 Pavilion Estates Drive, from

9    the sister, Elizabeth Ashley, of the defendant, who then

10   forwarded to me confirmation of that from a landlord, who is a

11   gentleman by the name of Jacob Cohen.  That's all I have on

12   that, Your Honor.  I do have --

13          THE COURT:  That's the address in Huntersville,

14   North Carolina?

15          MR. WATKINS:  That's in Huntersville, North Carolina,

16   Your Honor.  I have Mr. Cohen's phone number as well.  I have

17   not spoken directly with him.

18          THE COURT:  That would be the roommate or housemate,

19   correct?

20          MR. WATKINS:  I don't even know -- I know he's the

21   owner of the home.  I don't know -- I think he -- I don't know,

22   Your Honor.

23          THE COURT:  Understood.

24          Ms. Holman, do you have anything to add on that?

25          PRETRIAL SERVICES:  No, Your Honor.  I believe

1   defense counsel stated the same address as listed in the

2   pretrial services report.

3            THE COURT:  Okay.  Ms. Stump, another question

4   about -- I'm just trying to understand this electronic evidence

5   I assume you collected pursuant to a warrant.  You talked about

6   there being 1900 -- we'll just call them "hits" on the return,

7   only 12 of which involve some location information.  So I'm

8   trying to understand what that means and what I'm supposed to

9   derive from that.

10           MS. STUMP:  Yes, Your Honor.

11           THE COURT:  Are you -- and I have multiple questions.

12  One, are you saying that that is far below what one would

13  expect when trying to track a phone and is, therefore,

14  suggestive of someone who is making some efforts to limit the

15  amount of location information that his phone is putting off?

16  That is the first question.

17           And, second, is there some indication from the

18  evidence you've received that he did in fact have cell phone

19  coverage and he was just, you know, choosing not to use it?  I

20  thought you may have said the 12 hits reflected not only

21  location information, but cell phone, meaning non-Wi-FI cell

22  phone use, again suggesting that he would have a cell phone

23  plan.  It's not simply where literally he was without a cell

24  plan and he needed to use Wi-Fi.  So, those are all my

25  questions.  What can you tell me?

1       MS. STUMP:  Yes, Your Honor.  I would be happy to

2   provide additional information.  The information the

3   United States collected was pursuant to a federal search

4   warrant which allowed the United States to examine the GPS

5   location monitoring on an ongoing, realtime basis.  Mr. Bennett

6   has a carrier services through Verizon, so he actually does

7   have -- or, at the time we were collecting the information had

8   a plan with Verizon.

9       THE COURT:  A cell phone plan?

10       MS. STUMP:  Yes, Your Honor, a cell phone plan

11   through Verizon.  The way that Verizon collects data is

12   different from other cellular companies.  They provide data

13   every 15 minutes to -- in this instance it would have been the

14   FBI, pursuant to the search warrant.  Every 15 minutes the data

15   they provide, if the cellular services are turned on or are

16   being used, can contain latitude and longitudinal information,

17   GPS information in realtime, where the phone had been in

18   that -- anywhere in that 15-minute period, as I understand it.

19   It could have been right at the 14:59 or sometime in this

20   period.

21       So the number I provided to the Court of

22   approximately 1900 pings would have been every 15 minutes from

23   the date of the warrant, March 25th, through the date he self-

24   surrendered, April 12th.  Every one of those, had the cellular

25   services been on so that GPS information could have been

1   collected, in my understanding, would have provided GPS

2   information, had the cellular GPS information been available to

3   take from the cell phone.  In other words, here it was turned

4   off, the cellular services were turned off, either because the

5   phone was in airplane mode, the phone was -- in which case that

6   GPS location information wouldn't be collected; Wi-Fi services

7   were being used, or that GPS information was intentionally

8   turned off.

9          And, Your Honor, we believe that to be the case.  It

10  was intentionally turned off.  Because, we, as well as

11  collecting this GPS information on our warrant, we had

12  permission to collect call detail records.  Those records show

13  that Mr. Bennett continued to use his phone, as I mentioned

14  yesterday, predominantly for text messaging.  However, some

15  cellular calls were made.  And some of those calls were the

16  12 -- some of them were with FBI, as we discussed yesterday, in

17  which the GPS could be collected.  And others were with friends

18  or family, in which he actually did turn on the cellular data

19  to make a phone call.

20          THE COURT:  Is that the 12 hits, the GPS hits?

21  That's when he was using cellular data and you could collect

22  GPS information?

23          MS. STUMP:  Yes, sir.  We were only able to collect

24  it 12 periods in that period where the GPS location was turned

25  on to -- for the cell company to capture that data off of a

1        tower.

2                 THE COURT:  Okay.  Then I just want to make sure I

3        understand, you say that he destroyed his iPhone on the way to

4        the courthouse.  I assume that means on the way to turn himself

5        in on the warrant, is that correct?

6                 MS. STUMP:  Yes, Your Honor.  He told agents he threw

7        his phone out the window.

8                 THE COURT:  Okay.  That was my next question.  How do

9        you know that?  He said that to the agent, is that correct?

10                MS. STUMP:  Yes, Your Honor.

11                THE COURT:  How do you know that he destroyed the

12       other phone?  You said that he was using yet a different

13       iPhone, different than the one he stated that he threw out the

14       window, and he's using a different iPhone on January 6th.  What

15       can you tell me about that phone and why you think it has been

16       destroyed or --

17                MS. STUMP:  Your Honor, to the extent that I led the

18       Court to believe he destroyed that one, I apologize.  We have

19       no information on the location of that phone, if it's been

20       sold, traded, stored, trashed.  We have no information on that

21       cellular phone.  We do know the make and model of that phone.

22                THE COURT:  It was a different phone than the one

23       that you believe he admitted to destroying on the way to the

24       courthouse?

25                MS. STUMP:  Yes, sir.  We know that based on records

1      from Verizon, his cellular provider.

2              THE COURT:  All right, Mr. Watkins, anything you want

3      to add to any of that?

4              MR. WATKINS:  Yes, sir.  Just very briefly, Your

5      Honor.  The fact that you have a cell phone plan does not mean

6      that you necessarily have cell phone access.  That's

7      particularly true in parts of the country that are very rural.

8      When you're traveling from Texas to the East Coast, you're

9      going to go through vast gaps of challenging service.  Also,

10     when you're operating your internet business and you want to

11     create a hot spot so that you can transact business in your

12     laptop, you turn off your cellular service and you create a

13     maximum amount of Wi-Fi space that you can utilize to place

14     your laptop next to it and use the phone as the creator of the

15     hot spot that's used as the internet.

16              And that's -- that's just one part of this.  And

17     what's troubling here is the insinuation of the government that

18     somebody is utilizing Wi-Fi for communication as being indicia

19     of nefariousness is very odd.  Because increasingly, among

20     young people especially -- and I say this as the father of way

21     too many kids -- they prefer utilizing phone service via Wi-Fi.

22     It's faster, in terms of accessing the person that you're

23     calling, and they like it better.

24              Also, they don't have to buy phone plans or use phone

25     time under their phone plan, if they're calling on -- using a

1    Wi-Fi phone system.

2           The Verizon plan that I'm familiar with, how Verizon

3    works, when the government does seek data from Verizon, Verizon

4    has a pretty good system and what they do is they give you the

5    number of pings, and the number of pings are just the number of

6    times that they're trying to check for where this phone is.

7           The latitude and longitude issues have been a little

8    bit troubling with Verizon because of some overlap that they

9    have.  As a result, sometimes you have erroneous longitude and

10   latitude results that are given.  They are not significantly

11   erroneous, but they're off.  And you see that a lot in urban

12   areas.  An example of that is when you use the app on your

13   phone to garner directions.  And you look at it, it says that

14   you're on, you know, 10th Avenue when you're really on 9th

15   Avenue.  So, it's off sometimes.  And Verizon is known for

16   that.

17          And as for trashing the phone, there's nothing

18   nefarious about it.  I mean, the guy -- my client, I shouldn't

19   refer to him as "the guy," and I apologize to defendant -- was

20   frustrated with his phone.  He had been frustrated with the

21   earlier phone.  He bought a rebuilt phone, you know, and, you

22   know, it's a secondary market phone and, you know, he told the

23   FBI, "I trashed it."  But what that has to do with the -- in

24   other words, he wasn't trying to shroud that in secrecy, he

25   wasn't trying to hide it; he was very forthcoming about it.

1          And I wanted to point out that in the interim period

2     between the two dates that I shared with the Court as being

3     significant, between the 31st of March and the 12th of April,

4     there were four weekend days, and the defendant showed up and

5     self-surrendered on Monday.

6          So, the question here is whether the defendant is a

7     flight risk.  U.S. pretrial services acknowledges it's low.

8     The appearance -- likelihood of appearance is -- there should

9     be no question -- this is a man whose roots are where he's

10    living, and his sister is there, his niece is there, and his

11    mother who -- is there.  He doesn't have languages under his

12    belt that permits him to go to move to Karachi, Pakistan and

13    live there.  And doesn't have a passport that's valid.  And

14    while I don't have intimate knowledge of his financial

15    condition, I can tell you that I'm not relying on his resources

16    alone for the purposes of my engagement.

17          THE COURT:  Okay.  Well, thank you for that.

18          MR. WATKINS:  Thank you.

19          THE COURT:  Both sides, I thought the presentation

20    was excellent.  Certainly gave me a lot to think about last

21    night.

22          This is a difficult case.  You know, I think the

23    government, as I outlined, has significant evidence at this

24    point that the defendant was seeking to avoid law enforcement

25    after he became aware of the warrant for his arrest.  But,

1    ultimately he self-surrendered.  That's truly the best fact

2    that you have.  Had the defendant been arrested after this 20

3    or so days of -- in the government's evidence, that he was

4    seeking to evade law enforcement, the Court's decision would be

5    easy.  He would have clearly been held.  So it's the fact that

6    he turned himself in on the 12th that makes this decision a

7    difficult one.  And I acknowledge that.

8         Nevertheless, I do think the government has met its

9    burden at this point, which is just to prove by a preponderance

10   of the evidence that the defendant is a serious risk of flight.

11   And I find that they have met that burden.

12        Mr. Bennett, I'm going to be issuing a detention memo

13   shortly which will describe in some detail the basis for my

14   decision, but I also want to outline it here for your benefit,

15   the benefit of anyone else who may be listening.

16        As you know, you can appeal this decision and perhaps

17   Judge Boasberg will view this, these issues differently.  This

18   is a difficult case, I think, because of your ultimate decision

19   to self-surrender.

20        The Bail Reform Act requires the Court to look at

21   four different factors in determining whether or not someone is

22   a serious risk of flight.  First is the nature and

23   circumstances of the offense.  I mean, here the government has

24   proffered and has evidence to support that you were involved in

25   the assault on the United States Capitol and January 6th

1    storming of the Capitol.  You were certainly an active and

2    knowing participant in the chaotic conduct at the Capitol on

3    that day.  Evidence suggests that you climbed up something, a

4    scaffold perhaps, went through a door and made it all the way

5    into the Senate chamber, into the Senate gallery.

6             You were making statements on social media prior to,

7    after and during events on January 6, indicating, your own

8    words, that "Look where I am at.  Right now in the Senate

9    gallery."

10            You later admitted on social media, according to the

11   government's proffer, that you stormed the Capitol.  You also

12   had various statements that you made even before January 6,

13   also on social media, indicating, "Fair warning, if this

14   election is stolen for Biden, patriots will go to war."  And

15   then suggesting, during the events on the 6th, that you were

16   fighting for freedom.  And after the storming of the Capitol

17   concluded you suggested that today was a revolutionary message,

18   we won't go away, we will find victory.

19            That's the government's evidence.  It may turn out

20   that it wasn't your account, you didn't make those statements.

21   Ultimately they would have to prove all that.  But this is what

22   they've proffered to me.

23            So, I do think that those are serious actions.  Those

24   are -- in general, indicate a disregard of the law and the

25   institutions that uphold it.  Nevertheless, you are only in the

1    Capitol for about ten and a half minutes, according to

2    Mr. Watkins.  I'll take his word on that.  There's no evidence

3    of your forced entry into the Capitol, no evidence that you

4    possessed weapons, no evidence of violent assaults on law

5    enforcement or others; not a member of an extremist group that

6    the government, you know, has offered me any proof of, in any

7    event; not the sort of leader or planner of events on the 6th,

8    all of which, those factors, have led to the detention of

9    others as a danger.  There are no indicia of that in this case.

10         The government is not seeking to hold you here as a

11   danger, but as a risk of flight.  And you do face at least one

12   felony charge, that's the obstruction of official proceeding,

13   it carries with it up to 20 years in jail.  The guidelines that

14   the government suggests, they calculated your guidelines and

15   suggested that the low end of the guidelines, even with your

16   fairly minimal criminal record, that they have calculated your

17   guidelines to be 41 to 51 months.  So 41 months on the low end.

18   That is a significant sentence that you face in this case.

19         I emphasize all that because I think it is -- it is

20   pertinent to the risk of flight analysis in a few ways.  First,

21   that this offense is serious enough, significant enough to

22   justify you being held as a risk of flight.  Putting it another

23   way, it's not just misdemeanors where you could end up being

24   held longer than any reasonable sentence in this case.  I don't

25   think that that's the situation here because of that felony

1    charge that you have.  Some courts, some judges on this court

2    have been concerned about that issue in some of these Capitol

3    cases.  I don't think that is an issue here.  You do stand

4    charged with a felony, unlike your codefendant.

5           So, facing, also, a 20-year charge and guidelines

6    that would suggest a low end of 41 months, well, as other

7    courts have indicated, that does provide an incentive to flee.

8    It's a lot of time.  It's a serious offense that you face.  You

9    face a serious sentence, if you're found guilty.  I don't rely

10   just on that.  But I think that all of those factors together

11   do -- or, I conclude that this first factor, which is the

12   nature and circumstances of the offense, do weigh in favor of

13   you being held as a risk of flight.

14           With respect to the strength of the government's

15   evidence, which is the second factor the Bail Reform Act

16   requires the Court to look at, does appear to me, based on the

17   government's proffer and the evidence that they set forth in

18   the complaint, that they have a very strong case here.  You

19   made numerous inculpatory statements, posts on social media,

20   some of which I mentioned a moment ago.  The government says

21   they were your statements, they were on your account.  They'll

22   have to prove that, but that's their proffering to me.  The

23   statements reflected upon your intention, your motivations,

24   your actions on the 6th.

25           There's also photos of you and the codefendant, the

1    government tells me, participating in the riot inside of the

2    Capitol.  There's also surveillance video from inside the

3    Capitol placing you and your codefendant inside the Capitol.

4    There's also, they tell me, a video or videos that you posted

5    or posted on your codefendant's social media account, or both,

6    again, showing you entering the Capitol and then the gallery of

7    the Senate.  According to the government, there's also at least

8    one confidential informant, that's known you for some time, who

9    has identified you in those photos and in those videos.  So

10   that's a pretty strong case.  In my view, it's quite

11   overwhelming.

12          That's important to the analysis here, similar to the

13   reason I stated a moment ago.  Not only do you face a serious

14   charge -- it's a significant offense, significant jail if

15   you're found guilty -- but also, it's based on the government's

16   proffer here.  They have a very strong case, which I think

17   contributes to, certainly, my conclusion that that creates a

18   motivation to flee.

19          Your client -- your attorney suggested, perhaps, the

20   defense of following orders you were told, the former president

21   telling people to storm the Capitol.  You know, those are

22   issues for a later day, as to whether or not that defense is

23   going to have legs here.  There are multiple judges in this

24   courthouse -- and I happen to agree with them -- that cite to

25   the Chief Judge's decision in *Chrestman*.  Chiefly, she was the

1    first one who suggested that a defense like that, "I was just

2    following orders," is unlikely to be successful in this case.

3          Thus, I do find that the second factor, which is the

4    strength of the government's evidence -- which I do find to be

5    very strong, the fact that you face up to 20 years in jail --

6    that those two facts together provides a strong incentive to

7    flee in this case.

8          The Bail Reform Act also requires a look at the

9    history and characteristics of the defendant.  Your criminal

10   record is mostly minor; it's not pristine, either.  I guess the

11   most pertinent conviction is the one from 2015, defrauding a

12   hotel.  There's some suggestion of fraudulent conduct, which

13   could impact the analysis as I think about whether or not I can

14   trust that you will follow conditions of release that I might

15   set.  That would suggest that perhaps I should be wary of that.

16   But I don't weigh that very strongly.

17         And I do look at the fact that in your criminal

18   record you have no failures to appear, no bench warrants, no

19   contempt charges, no indication of, really, material violations

20   of supervision in the past.  And I credit all of those.  I

21   think all of those factors weigh in favor of your release.  And

22   I have added that into my calculus.

23         But the government's major evidence with respect to

24   you being a risk of flight is what -- what else happened after

25   they tried to execute the arrest warrant.  So I'm just going to

1    review that as part of the record here, my decision here today.

2            Let me first just say that there has been some

3    question about, you know, your contacts, where you're living,

4    who knows where you're living.  I think it's clear you don't

5    have any contacts in D.C.  But as other judges have said in

6    these cases, and in other cases, that's not determinative.  If

7    you had solid contacts in another jurisdiction, that would

8    weigh in favor of your release in these cases.  Very few of the

9    400 people were from D.C. who have been arrested so far in

10   this -- with respect to events arising from the assault of the

11   Capitol on January 6th.

12           You know, the record is somewhat mixed.  Your

13   counsel, you know, admitted that you'd only recently moved back

14   to the Carolinas, that you'd previously, for some period of

15   time, been living in Texas with a girlfriend, you broke up and

16   went back.  You know, I don't see anything nefarious,

17   suspicious involved in that move.  But, the record is not

18   crystal clear about the connections that you have to

19   North Carolina.  Your counsel has suggested now that you do

20   have a verified address.  I'll credit that.  But, just as

21   concerning to me is the government's proffer that at least

22   during the period of time prior to April 12th, no one, friends

23   or family, seemed to know where you were.

24           This is not a case where I have a stack of letters

25   from members of the community and family members telling me

1    about all your connections to their community.  I don't know,

2    perhaps Mr. Watkins will pull that together for any appeal

3    before Judge Boasberg.  I've not seen that --

4            MR. WATKINS:  Your Honor, I -- I do apologize for not

5    presenting that to the Court.  The short time between the time

6    of my engagement and the --

7            THE COURT:  That's why there's appeal, Mr. Watkins.

8    I appreciate it.  I appreciate it.  Again, I think it's mixed,

9    it's not really the basis for my decision that the defendant, I

10   believe, is a serious risk of flight.  I'm, really, about ready

11   to come to that.

12           But, you know, this is certainly not as strong as the

13   record I've seen in other cases where people were indicating

14   they had very strong connections to a community outside of D.C.

15   It may be able to be shown, it may be, as Mr. Watkins

16   indicated, that you were just transitioning.  You know, nothing

17   wrong with that.

18           You know, the government is suggesting that, though,

19   for the period of time in which they were looking for you, you

20   were -- I think they used the word, they said "a couch jumper,"

21   someone with no fixed address.  Most important to me is that no

22   one seemed to know where you were.  You were missing.  Friends,

23   family, and also the FBI.  I'll come back to that in a moment.

24           The government proffers that on March 23rd they

25   attempted to arrest you and the codefendant in Texas; you were

1    not present.  Law enforcement were told, I assume by the

2    codefendant, that you had moved out on the 13th and returned to

3    North Carolina.  The codefendant provided no further details

4    about where your whereabouts were.  I don't make much of that.

5    And the fact of the matter is that when you left Texas, there's

6    no evidence that you knew anything about at arrest warrant.

7    And again, the arrest warrant wasn't even issued until March

8    19th.  And you left, according to the government's own proffer,

9    you left Texas on the 13th.  So, that's neither here nor there

10   to me.

11          But, the government's evidence that you tried to

12   evade law enforcement after the 23rd I think is more

13   compelling.  They tell me that you were an active poster on

14   Facebook, posting every day or every other day, and sometimes

15   multiple times in a day, and that you stopped on March 22nd.

16   Standing alone, that's not all that meaningful.  But I have a

17   number of facts that I'm going to be pointing to and that's

18   certainly one of them.  And as I look at the totality of the

19   circumstances, like I said, I do believe that the government

20   has demonstrated that you are a risk of flight.

21          The government has proffered that the FBI began

22   tracking your cell phone on March 25th pursuant to a warrant.

23   They proffered that the returns or pings from that warrant, you

24   know, suggested to them that you were limiting the number or

25   amount of location data that was being sent from your phone;

1    1900 pings, only 12 which provided the FBI with location data,

2    suggesting to the FBI that you were using airplane mode or

3    Wi-Fi or had turned off the location services on your phone.

4    Again, by itself I don't think anywhere near enough to meet the

5    government's burden.  But for me, another fact to consider.

6         Most pertinent here and most difficult for you to

7    deal with is that the statements that were made on or around

8    March 29th, government proffers that someone who you were in

9    contact with through text messages, law enforcement reached out

10   to that person and that person told law enforcement that you

11   admitted to them that you had been told about codefendant --

12   your codefendant's arrest.  That friend -- we'll just call them

13   a friend, I don't know if they were a friend or not, but

14   someone you were communicating with -- further reported that

15   you had stated that they were probably looking for him next,

16   and that he was laying low.  Further stated to that individual

17   that, the government proffers, that he could not stay on the

18   phone, you could not stay on the phone for long because you

19   assume the FBI were looking for you.

20        That individual further advised that you had stated

21   that you had started using the encrypted social messaging app

22   Telegram to communicate because of all the stuff they got going

23   on on the national level.  Telegram, the government proffers,

24   is an encrypted messaging application which is headquartered,

25   located outside of the United States.  It would be outside of,

1      the government suggests, the ability of United States of

2      America authorities or courts to search because of its

3      location.

4              The government also proffers that during this time

5      period you would call friends and just say "Telegram" and then

6      hang up, suggesting that that's what you wanted that friend to

7      do, was to get on Telegram and communicate with you that way.

8              Two days after the March 29th, that would be April

9      1st, the FBI actually left a message, both voicemail and text,

10     advising you of your arrest warrant, you need to surrender.

11     Again, that was on April 1st.  You did not surrender for

12     another 12 days.  During that time period your whereabouts were

13     unknown to law enforcement, even despite them trying to track

14     your phone.

15             Also unknown, the government proffers, your

16     whereabouts unknown to friends, family, including your sister.

17     At one point you were, apparently, the government believes

18     they've figured out, that you were staying in South Carolina.

19     Not North Carolina, South Carolina.  And that when you left

20     that location in South Carolina, you told the person you were

21     staying with that you were going to stay with family in

22     South Carolina.  The government proffers, based on their

23     investigation, that there was no family in South Carolina.

24             Apparently you did contact the FBI after March 29th,

25     did so multiple times.  You told law enforcement that you were

1    trying to get an attorney.  The government proffered yesterday

2    that there were multiple communications about you getting an

3    attorney and then suggesting, a few days later, well, you were

4    going to get another attorney.  Mr. Watkins was neither of

5    those attorneys.

6         I think, when I look at the record here presented by

7    the government, Mr. Watkins suggested, well, it's COVID, it's

8    hard to reach people.  I don't know if that's a fair inference

9    from what I've seen here.  It seems like you were in

10   communication with attorneys, trying to get advice, and yet you

11   kept changing your attorney.  You're allowed to change your

12   attorney; don't hold that against you.  But the government

13   wants to suggest that you were not quickly making yourself to

14   the courthouse to turn yourself in on that warrant.  Perhaps

15   you were not liking the advice that you were receiving from

16   these attorneys.

17        You did ultimately surrender on the 12th.  And like I

18   said, I give you credit for that.  That's what makes this hard.

19        But even considering that, I cannot ignore the

20   government's proffer with respect to what you did prior to

21   then, the record of what I think is fairly clear of your

22   attempts to evade law enforcement and, frankly, your success at

23   doing it.  The courts have looked in the past as to the

24   resources, the ability of a defendant to flee.  The government

25   tells me that, you know, they were looking for you since that

1      warrant was served, the 23rd, they attempted to execute it,

2      that they had no idea where you were between then and April

3      12th.  So, I think that that suggests to me you have some

4      facility, some ability to go missing.

5              The government has provided me with these manuals.  I

6      don't take anything from those.  I don't understand what those

7      books are about, based on the little blurbs the government gave

8      me.  They suggest that you are training people on how to live

9      off the grid.  I don't know that.  It might be in there, but

10     the government hasn't established that to my satisfaction.  I'm

11     just basing it on what you actually did:  That for 20-some days

12     you were able to go missing and the FBI, with all the resources

13     at their disposal, couldn't find you.  So I take that into

14     consideration when I evaluate whether or not you are a serious

15     risk of flight.

16             I think another big concern that I have is with

17     respect to your phone.

18             So, as Mr. Watkins argued, and argued well, you did

19     turn yourself in.  So, I mean, again, I think the best argument

20     for you is that whatever you were thinking and doing before the

21     12th, you finally realized that that's not the way to go, you

22     need to turn yourself in on that warrant.  I would be surprised

23     if someone told you that what you were doing may lead to you

24     being held in a case where you would not normally be held.

25             So to what extent does what you did on the 12th

1   reflect a true change of heart?  Well, one significant factor

2   in my analysis is, is the statement that you made to law

3   enforcement that, literally on the way to the courthouse, you

4   threw your phone out the window.  Government suggested it was

5   new, Mr. Watkins says it was rebuilt.  Whatever, I'm sure it

6   was worth many hundreds of dollars.  An iPhone 11 Max or Pro --

7   I forget what the government says, we'll just say an iPhone

8   11 -- you threw it out the window on the way to the courthouse.

9   That, for me, does not sound like a person who's prepared to

10  follow the law and the dictates of this Court.

11          The last factor is a danger to the community.  As the

12  government indicated yesterday, that -- I mean, it's right

13  there in the Bail Reform Act.  But as other courts have noted

14  in the analysis of serious risk of flight, it is the least

15  important.  For what it's worth, you know, as I compare you to

16  other cases, and especially other cases involving the riot on

17  the 6th, where the defendant's been held as a danger, you don't

18  fit into those categories.  Individuals who had weapons,

19  assaulted police officers, forcible entry into the Capitol,

20  members of extremist groups who were planning and instigating

21  the riot, both before and during the riot itself, you know,

22  those are the individuals who have been held.  You don't fall

23  into any of those categories.  So to the extent the danger is

24  significant to the risk of flight analysis, I'm not saying that

25  you are a danger.

1                  But I think the ultimate decision is whether or not

2          you are a risk of flight, a serious risk of flight.  And I do

3          think the government has met its burden here to show, just by a

4          preponderance of the evidence -- not clear and convincing, as

5          you would, you have to be demonstrated to be a danger, but by a

6          preponderance that you are in fact a serious risk of flight.

7          And I do not believe that there is any conditions of release or

8          combination of conditions of release that can reasonably

9          mitigate that risk.  I have considered those conditions.

10                 I mean, the fact of the matter, the truth is that

11         someone who is determined to flee, well, there's no conditions

12         that you can place them in to avoid that.  Of course, the

13         standard is only reasonably assured.  I appreciate that.  But a

14         determined individual who wants to flee -- and maybe your

15         decision has changed now, hearing the low end of the guidelines

16         of what you may face in this case -- well, all you have to do

17         is cut off your GPS device.  The way the monitoring works, it

18         might be many hours before pretrial, certainly the Court, is

19         aware that that has occurred.  So GPS device does not stop

20         someone who is determined to flee.  And I think the record here

21         demonstrates by a preponderance that you are one of those

22         people.

23                 So, I do agree with D.C. pretrial's recommendation

24         that there's no condition or combination of conditions that

25         would reasonably assure your return to court.  That's my

1   decision.

2           Mr. Bennett, a few things.  Understand this, that

3   when you go to trial, if that's what you choose to do, the jury

4   will never know about my decision or my view of the facts as

5   I've just laid them out.  Also, you do have, as I said at the

6   beginning, the right to appeal this decision.  This is Judge

7   Boasberg's case, he's the district judge.  Mr. Watkins can

8   assist you in that appeal.  Perhaps Judge Boasberg will see

9   this differently.  It's a case, a decision not without its

10  challenges, again, because you did turn yourself in on the

11  12th.  I wish you hadn't destroyed your phone on the way to do

12  so.

13          All right.  That's my decision.  Do we have a next

14  date before Judge Boasberg?

15          MR. WATKINS:  Your Honor, thank you for your time

16  today.

17          THE COURT:  Do we have a next date?  Ms. Stump, is

18  there another --

19          MS. STUMP:  Yes, we have a setting on April -- excuse

20  me, May the 5th, at 2 p.m. Eastern.

21          THE COURT:  May 5th, 2 p.m.

22          MS. STUMP:  Excuse me, May the 4th, 2 p.m.

23          THE COURT:  May 4th, 2 p.m.  Mr. Bennett, you're

24  going to be before Judge Boasberg.  That will be the district

25  judge who will handle this case going forward.  He will preside

1     over the trial, if you want to go to trial.

2               Anything further requests from the government?

3               MS. STUMP:  No, Your Honor.  Thank you.

4               THE COURT:  Mr. Watkins?

5               MR. WATKINS:  No, Your Honor.  Again, thank you for

6     your time.

7               THE COURT:  Mr. Bennett, I do -- I wish you the best

8     of luck in your case going forward.  I mean that.

9               Parties are excused.

10              MS. STUMP:  Thank you, Your Honor.

11              MR. WATKINS:  Thank you, Your Honor.

12              I will try to get in touch with you shortly,

13    Mr. Bennett.

14                            *   *   *

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

     I do hereby certify that the foregoing is a true, correct

and complete transcript of the audio-recorded proceedings in

this matter, audio recorded on April 30, 2021, and transcribed

from the audio recording to the best of my ability, and that

said transcript has been compared with the audio recording.

                         Dated:  May 12, 2021


                         /s/_____

                         Janice Dickman
                         Official Court Reporter
                         333 Constitution Avenue
                         Washington, DC  20001
                         202-354-3267