**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-312 (JEB)** |
| **v.** | : | |
| | : | |
| **BRADLEY STUART BENNETT,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Bradley Stuart Bennett to a top-of-guidelines sentence of 12 months' incarceration and 1 year of supervised release. The government also requests that this Court impose 60 hours of community service, $500 in restitution, a fine, and a special assessment of $25 for each Class A misdemeanor and $10 for each Class B misdemeanor.

## I.    Introduction

Defendant Bradley Stuart Bennett, a 45-year-old independent contractor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Bennett pleaded guilty to violations of 18 U.S.C. §§ 1752(a)(1), (2) and 40 U.S.C. §§ 5104(e)(2)(B), (D), and (G). The government's recommendation is supported by the defendant: (1) making statements indicating his intent to stop the certification of the electoral college vote, including by going to "war" if Trump was not elected; (2) filming himself "storming the Capitol"; (3) remaining on Capitol grounds even after witnessing violence and chaos; (4) sending messages to others bragging about his conduct on January 6; (5) evading arrest for twelve days and lying about his whereabouts to the FBI in order to obstruct their efforts; and (6) throwing his phone out the window prior to his self-surrender to the FBI.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the government recommends that the Court sentence Bennett to 12 months of incarceration and one year of supervised release, a sentence which reflects the gravity of his conduct on January 6, including disrupting the certification with corrupt intent, and his subsequent efforts to evade capture and obstruct the FBI investigation.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 154 (Statement of Offense).

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Bennett's Statements Before January 6, 2021*

Shortly after the November 2020 election, Bennett began sending Facebook and text messages about the upcoming certification of the Electoral College votes.  For example, on November 17, 2020, Bennett posted a message that said, in part:

> [T]he media does not call these legal matters like a President-elect lol. Don't make me laugh.. There is a Constitutional process for that. It's an electoral college, Congress and SENATE certification by Vice President Pence.

A month later, on December 17, 2020, Bennett sent a Facebook message that said, in part, "He has VP Pence (Head of Senate) as final arbiter of which ballots to accept January 6." On December 28, 2020, Bennett sent a message on Facebook: "Who's headed to the nations CAPITOL to make some EPIC HUGE noise with PATRIOTS January 6?! Sounds like a massive event coming together to be a part of history!"

On January 2, 2021, Bennet updated his Facebook profile to a warning that if the election results did not turn his way, Bennett was prepared to go "TO WAR." *See* Image 1.



*Image 1: Bennett's Facebook Profile Picture on January 2, 2021*

On January 6, 2021, Bennett and his co-defendant and then-girlfriend, Elizabeth Williams, attended the former President's rally. After the rally, they made their way to the Capitol and participated in the riot on the Capitol Grounds.

*Bennett's Role in the January 6, 2021 Attack on the Capitol*

At approximately 12:44 p.m., Bennett along with Williams, made their way to the Peace Circle. At approximately 1:00 p.m., rioters broke past barriers and the police line on the Pennsylvania walkway near the Peace Circle. Bennett filmed himself cross onto the restricted grounds shortly after 1:00 p.m. stating, "We're storming the Capitol right now," "We're on the lawn of the United States Capitol." See Image 2 and Exhibit 1.



*Image 2: Still Image from Exhibit 1 at 00:00*
*showing Bennett on the Restricted Capitol Grounds*

Bennett went to the West Plaza of the Capitol where officers had formed a protective line behind a line of metal barricades. Bennett watched as other rioters breached those barricades and the police line, witnessed officers discharging tear gas and chemical irritants, observed officers physically attempting to move rioters from the restricted area, and watched as one officer had to turn and retreat as other rioters were getting around and behind her. *See* Image 3 and Exhibit 2. He also filmed many of these encounters.



*Image 3: Screenshot from Exhibit 2 at 1:30, showing*
*Bennett (top of his hat circled in red) on the West Plaza of the Capitol*

Bennett remained on the West Plaza for over an hour while rioters swarmed the grounds

and battled with police, and as police struggled to regain control of the area. Bennett then made

his way to the Upper West Terrace, where he said on video:

> "We climbed up. We stormed it. We went through the, uh, the scaffolding. We're now
> going to go to the door over here. Here we go. Freedom, baby. The tyranny ends today,
> January 6, 2021. One million strong in D.C. Hey, if we go down, we're going to go down
> fighting. We're going to go down fighting for freedom, we're not going to sit on the couch.
> We're going to do what we gotta do."

*See* Exhibit 3, at 00:00-00:22. Ignoring the clear signs that he should not be on the Capitol grounds,

at approximately 2:23 p.m., Bennett entered the Capitol building through the Senate Wing Door.

See Image 5 and Exhibit 4.



*Image 5: Still Image from Exhibit 4 at 00:04, showing Bennett (circled in red)
entering the Capitol through the Senate Wing Door at approximately 2:23 p.m.*

Once inside, Bennett recorded himself saying, "We are inside the Capitol." Bennett walked

to the Crypt, and recorded himself yelling "We're in the Capitol." When the Crypt was overrun by

rioters, Bennett and Williams traveled to the Rotunda and continued taking videos of their

activities.



*Image 6: Still Image from Exhibit 5 at 3:30, showing Bennett (circled in red) inside the Rotunda*

After exiting the Rotunda, Bennett walked past a door near the East side of the Rotunda –

a door which would have led him outside of the building. Instead of exiting, Bennett decided to

remain inside the Capitol and went to the Senate Gallery. While in the Senate Gallery, Bennett

recorded himself saying, "Look where I am." *See Exhibit 3, at* 00:59-1:04.



*Image 7: Screenshot from Exhibit 3 at 1:00 showing Bennett inside the Senate Gallery*

After spending approximately two minutes in the Senate Gallery, Bennett explored more

areas on the east side of the Capitol building, and stood near an exit door looking out to the crowd

on the East Plaza. *See* Image 8-9.





*Images 8-9: Still Images from CCTV of Bennett and Williams Looking through Exit Door onto the East Plaza and Turning Back Into the Building*

Again, instead of exiting, Bennett chose to remain an active participant in the riot and he did not leave. Bennett eventually walked to the first floor, where he encountered officers and was instructed to leave. He finally exited the building at approximately 2:50 p.m. through the Senate Wing Door, after spending roughly 27 minutes inside the Capitol building.

*Bennett's Statements After January 6, 2021*

In the evening of January 6, at approximately 6:00 p.m., Bennett posted on Facebook about his experience, leading with "CAPITOL WAS STORMED" and recalled that he was "hardcore tear gassed by cap[itol] police on the front steps of the Capitol before breach." *See* Image 10. He claimed that the day "WAS A REVOLUTIONARY MESSAGE" and vowed that he and his companions "WON'T GO AWAY WE WILL FIND VICTORY!" *Id.*

**Time** 2021-01-06 22:00:20 UTC
**Message** CAPITOL WAS STORMED.   I DO BELIEVE A PATRIOT WAS SHOT.  WE LOST  A FEMALE.
MY deepest heartfelt love and sympathy goes out to losing one of our own.   There
were Ant•ifa instigators.   They embedded as supporters.  They gassed us.  The
Trump folks never broke a thing. I saw no severe violence. And certainly not from
the right.   We were also flashbanged and hardcore tear gassed by cap police on the
front steps of the Capitol before breach.    But GREATER is he that lives in us than he
than lives in the world.  Despite a few weirdos (it's a million to two million people) ..
everyone was orderly.   WE are safe and nursing one wounded warrior with us who
took not one but two flashbangs to the leg and then face.   Please pray for John
TODAY WAS A REVOLUTIONARY MESSAGE.   You Can argue who went inside all you
want, but the truth is the lying media has a narrative of chaos and insurrection by 1
million people being painted as in the wrong for anger over lockdowns, hurt
businesses & a stolen election.   WE ARE CIVIL.  BUT WE WON'T GO AWAY  WE WILL
FIND VICTORY!  ✕

*Image 10: Bennett's Facebook post on January 6, 2021 at 6:00 p.m.*

Approximately two hours later, Bennett admitted that he "stormed" the Capitol and that he went "in that senate room." He also sent a text message that read, in part, "We were gassed and flashbanged like crazy but we climbed and hiked up and inside." He also stated, "Wildest day ever and it's so still so surreal we stormed the greatest Capitol on earth. That was so intense. We are so fatigued."

Among many messages, Bennett also admitted that his actions of going inside the Capitol building on January 6 stopped the "senate vote." He stated:

> "If they had really wanted to stop people from getting in they could have, but it would have taken more force. I actually think Trump wanted for people to get in. And it served a purpose of making a statement, as well as stopping the senate vote."

*See* Statement of Offense, ECF No. 154 at 9.

*Bennett Evading Arrest*

Bennett took other steps to avoid arrest. From approximately March 16, 2021, through March 30, 2021, Bennett stayed with a friend in Fort Mill, South Carolina.  On March 29, 2021, six days after Williams was arrested, Bennett left a voicemail for a friend: "I don't know if you can help but they arrested her, she's released and they're probably looking for me.  I'm just laying low."  Two days later, an FBI agent left a voicemail and sent a text message to Bennett, advising him about the arrest warrant and his need to surrender. Bennett did not surrender for twelve days.

When Bennett decided to leave this residence, he lied to the FBI about his plans. Though Bennett previously posted on Facebook several times a week, he stopped posting on Facebook altogether. He also started using Telegram, an encrypted social messaging application, to communicate with friends. Several individuals reported that Bennett would call and say, "Telegram" and then hang up, to encourage them to contact Bennett on that encrypted platform. Bennett last called law enforcement on April 9, 2021, and call detail records show that Bennett last used his phone at approximately 8:00 pm on April 11, 2021, approximately 12 hours before his surrender. Bennett admitted to tossing his phone (a new phone he obtained after January 6, 2021) on the highway.

*The Charges and Plea Agreement*

On September 6, 2023, the United States charged Bennett by a six-count Superseding Indictment with violating 18 U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. 5104(e)(2)(B), (D), and (G). On January 4, 2024, two weeks before trial was scheduled to begin, Bennett pleaded guilty to Counts Two through Six of the Superseding Indictment, charging him with a violation of 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. 5104(e)(2)(B), (D), and (G). There was no plea agreement at the time of Bennett's guilty plea. The Court continued trial on the remaining felony count pending the Supreme Court's opinion in *Fischer v. United States*, 603 U.S. 480 (2024). On September 12, 2024, the Court granted the government's motion to dismiss Count One of the Superseding Indictment.

## III.    Statutory Penalties

Bennett now faces a sentencing for violating 18 U.S.C. 1752(a)(1), and (2); and 40 U.S.C. §§ 5104(e)(2)(B), (D), and (G).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

**Count Two: 18 U.S.C. § 1752(a)(1)—Entering and Remaining in a Restricted Building or Grounds**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) (Trespass) |
|---|---|---|
| Specific offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Adjustment | +2 | U.S.S.G. §3C1.1 (Obstructing or Impeding the Administration of Justice) |
| Total | 8 | |

**Count Three: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) (Obstructing or Impeding Officers) |
|---|---|---|
| Adjustment | +2 | U.S.S.G. §3C1.1 (Obstructing or Impeding the Administration of Justice) |
| Total | 12 | |

*See* PSR at ¶¶ 38-58.

Under U.S.S.G. §3C1.1, the offense level is increased by two levels when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice

11

with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and the obstructive conduct related to the "offense of conviction and any relevant conduct." This enhancement includes destroying or concealing evidence that is material to an investigation or judicial proceeding. U.S.S.G. § 3C1.1 cmt. 4(D); but it is not intended to punish the defendant for avoiding or fleeing from arrest. *Id.* cmt. 5(D). Bennett's conduct was not a panicked response to an unexpected situation. Bennett knew that he was being investigated for his conduct at the Capitol, knew that there was a warrant for his arrest, and took active steps to avoid detection. Then, within the 12 hours of self-surrendering, Bennett tossed his phone on along the highway. By tossing out his phone, Bennett demonstrated his understanding that it contained some incriminating evidence, either of his participation in the riot, his fugitive status, or both.  In this broader context, Bennett's act of throwing out his cellphone warrants an obstruction enhancement here.

The U.S. Probation Office calculated Bennett's criminal history as a I. PSR at ¶ 100. Accordingly, the U.S. Probation Office calculated Bennett's total adjusted offense level, after acceptance, at 10, and his corresponding Guidelines imprisonment range at 6-12 months. PSR at ¶ 100.  Because Bennett has a criminal history point, he is not eligible for zero-point offender adjustment pursuant to U.S.S.G. § 4C1.1(a)(1). PSR at ¶ 57.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

But in this case, as in many cases arising from the extraordinary events of January 6, 2021, the defendant's Guidelines range does not fully capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law. Indeed, as it stands now, nothing in Bennett's guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.[2] There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. Thus, a sentence at the high end of the defendant's range is the minimum necessary to properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be

---

[2] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of

government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.").

To be clear, the fact that the government is not seeking a variance or departure does not diminish the need to appropriately account for the conduct and the crime, as a high-end sentence of 12 months in custody would do.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months imprisonment and one year of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bennett's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bennett, the absence of violent or destructive acts is not a mitigating factor. Had Bennett engaged in such conduct, he would have faced additional criminal charges.

The most important factors in Bennett's case are his clear intent to disrupt the peaceful transfer of power, his violent rhetoric and statements showing his intent, his disregard for the violence and chaos around him, and his efforts to evade arrest and destroy possible evidence.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 12 months' imprisonment and one year of supervised release.

### B.  Bennett's History and Characteristics

As set forth in the PSR, Bennett has a 2015 conviction for defrauding a hotel and several traffic infractions. ECF No. 159 at ¶¶ 63-67. Bennett reported that he received his associate's degree in 2002 and currently works as an independent contractor installing and repairing

telecommunications equipment. *Id.* at ¶¶ 86 and 89. Bennett has been compliant with his conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Bennett's history of arrests do not reflect a law abiding life. Bennett has had a number of encounters with the criminal justice system, including for defrauding a hotel in 2015, to which he pleaded guilty. His actions on January 6, in conjunction with his history of prior arrests and convictions, reveal a clear pattern of disrespect for the law. Those prior experiences with the criminal justice system did not deter Bennett from committing more serious crimes on January 6.

Bennett's post-January 6 conduct and statements are troubling. He explained that it as " surreal" and the "[w]ildest day ever." He said his conduct "served a purpose of making a statement, as well as stopping the senate vote." In addition, he viewed it as a "REVOLUTIONARY MESSAGE." These are not expressions of remorse, but of pride. When he knew he was going to be arrested, instead of promptly turning himself in, Bennett evaded arrest for twelve days, lied to the FBI, and threw away his phone, all in effort of curtailing further investigation. Since 2021, he has been evading taking responsibility for his actions and only expressed remorse when he was interviewed by probation in preparation for sentencing. See PSR at ¶ 37.  The Court should view any remorse Bennett expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he

did. And that is when he felt remorse, and that is when he took responsibility for his actions.")
(statement of Judge Chutkan).

Bennett did not accept the results of the 2020 presidential election, so he encouraged violence, invaded the Capitol, occupied the Senate Gallery, and boasted about his intent to show force and stop the certification of the electoral college vote. The Court must sentence Bennett in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence Bennett based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Post *Fischer*, judges have sentenced defendants to significant jail time where the nature of their crimes significantly contributed to the delay of the certification of the electoral college vote and interfered with the peaceful transfer of power.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Marroquin*, 23-CR-338 (JEB), Marroquin entered the Capitol, where he made his way to the front of a crowd of rioters trying to force open the barricaded door to the House Chamber. There, he looked through the broken glass and told officers—who were pointing their guns at him as they tried to protect lawmakers sheltering inside the House Chamber—that he did not mind dying. Marroquin stayed in the Capitol for over an hour despite orders to leave the building. The Court sentenced Marroquin to six months of imprisonment. Though Bennett spent less time inside the Capitol, Bennett's conduct warrants a longer sentence. First, Bennett was at Peace Circle for the initial breach onto the restricted grounds and recorded a video explaining that he was storming the Capitol. Second, Bennett spent a significant amount of time on Capitol grounds—over an hour—before ignoring broken windows and a blaring alarm as he breached the Capitol. During this time, he witnessed the chaos on the West Plaza, and was mere feet from officers who were forced to retreat as rioters flanked them. Third, Bennett attempted to avoid arrest and then destroyed his phone before turning himself in.

In *United States v. Adams,* 21-CR-354 (APM), Adams was one of the first rioters to enter the Capitol through the Parliamentarian door. He made his way into the Senate Chamber, took photos and videos, and did not leave until he was forced out by Capitol police. The court originally sentenced Adams to 14 months imprisonment but had resentenced him to 5 months and 5 days after the 1512 charge was dismissed, leaving the defendant with a sole count of 1752 for resentencing. Although both Bennett and Adams spent roughly the same amount of time inside the Capitol, Bennett spent a significant amount of time on the West Plaza—where he witnessed chaos and rioters overrunning police—before entering the Capitol. And, unlike Adams, Bennett publicly minimized rioters' actions on January 6, claiming that "everyone was orderly." In addition, Bennett admitted that his conduct served to the certification process and attempted to destroy

evidence by throwing away his phone. As such, Bennett's conduct warrants a lengthier sentence than the sentence imposed in *Adams*.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Bennett was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of

full restitution without respect to a defendant's ability to pay.[4]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Bennett to pay $500 in restitution for his convictions on Counts Two and Three. This amount fairly reflects Bennett's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

The defendant's convictions for violations of 18 U.S.C. §§ 1752(a)(1), (2), and 40 U.S.C. §§ 5104(e)(2)(B), (D), and (G) subject him to a statutory maximum fine of $100,000 for Counts Two and Three and $5000 for Counts Four, Five, and Six. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

The PSR indicated that Probation has not found any crowdfunding pages in Bennett's name based on their cursory internet check. PSR ¶ 95. However, there were two crowdfunding pages made to benefit Bennett in 2021. According to records obtained from GiveSendGo, a fundraising page titled "Wheels for Brad" was created by Pamela Denlinger to support the defendant in him getting a new car. The request for donations, purportedly written by the defendant, references his

25

charges and incarceration for being "peacefully present" on January 6 and asks for money for his new car. *See* Exhibit 6. Although the page was created by Pamela, she sent an email to GiveSendGo indicating that she is a friend of Bennett and was indeed raising money for him. *See* Exhibit 6A at 2. The "Wheels for Brad" fundraising page raised a total of $9,295. *See* Exhibit 6. The second fundraising page titled "Stand for Brad," also references his charges for his actions on January 6 stating that Bennett was a "target… by the government surrounding the President's event in January" and his "friends" were raising money to support him, however the account owner's name was Bennett. *See* Exhibit 7 and 7A. Additionally, the phone number and email associated with this account belonged to Bennett. *See* Exhibit 7A[5]. The "Stand for Brad" fundraising page raised a total of $5,310. *See* Exhibit 7. The total money Bennett raised from both pages was $14,605.

In addition, Bennett did not provide the Probation Office with a signed financial statement, a signed consent form authorizing the release of his financial information, or documentation of his tax filings. PSR ¶¶ 92-97. Considering his fundraising (which he failed to disclose to the Probation Office), and his refusal to provide the required financial information, Bennett has not shown an inability to pay.  Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4000 - $40,000. U.S.S.G. § 5E1.2(c).

---

[5] The full email address and phone number have been redacted.

## VIII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 12 months of imprisonment, 1 year of supervised release, 60 hours of community service, $500 in restitution, a fine, and a special assessment of $25 for each Class A misdemeanor and $10 for each Class B misdemeanor. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Bennett's liberty as a consequence of his behavior, while recognizing his decision to plead guilty.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Nialah S. Ferrer*
NIALAH S. FERRER
Assistant United States Attorney
New York Bar No. 5748462
United States Attorney's Officer
District of Columbia
Nialah.Ferrer@usdoj.gov
(202) 557-1490

ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov